**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

KERRIE W. BRIGGS,

        Plaintiff,

    v.                            ACTION NO. 2:06cv154

GARY W. WATERS,
WILLIAM O. WATSON, in his official
capacity as Sheriff of the City of
Portsmouth, and
THE CITY OF PORTSMOUTH SHERIFF'S OFFICE,

        Defendants.

## OPINION AND ORDER

    This is a civil rights action brought by Plaintiff Kerrie W. Briggs ("Briggs") against her former employer, Defendant Gary W. Waters ("Waters"), and, on the theory of successor liability, against Defendants William O. Watson, in his official capacity as Sheriff of the City of Portsmouth, and the City of Portsmouth Sheriff's Office.[1]  This matter comes before the court on motions for summary judgment filed by Waters and the Sheriff Defendants. For the reasons set forth herein, Waters's motion for summary judgment is **DENIED,** and the Sheriff Defendants' motion for summary judgment is **DENIED.**

---

    [1]The court will refer to the latter two defendants in this Opinion and Order collectively as "the Sheriff Defendants."

## I.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In reviewing a motion for summary judgment, this court must view the facts in the light most favorable to the non-moving party.  Lee v. York County Sch. Div., No. 06-1363, slip. op. at 8 (4th Cir. May 2, 2007); Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004); Blankenship v. Virginia, 432 F. Supp. 2d 607, 611 (E.D. Va. 2006).  Thus, the facts are presented below in Part II.A in the light most favorable to Briggs.  Importantly, neither this court nor a jury has made any findings of fact at this stage of the litigation, and the parties disagree as to whether some of the facts set forth below are true.

2

## II.  Factual and Procedural History

**A.  Factual History**

On June 1, 1998, Briggs was appointed a deputy sheriff by Waters, who was then Sheriff of the City of Portsmouth.  She was assigned to work in the jail facility, which is located in a building that also houses an administrative office and a front lobby.  Briggs generally worked twelve-hour shifts and alternated between the day shift and the night shift at thirty-day intervals. When she worked the day shift, she was sometimes required to fill in for the secretary in the front lobby during the secretary's lunch break.  While doing so, she would often see Waters.

Briggs asserts that Waters greeted her in a manner that made her very uncomfortable.  Upon seeing Briggs in the front lobby, he would call her "pretty lady" and then hug her.  Briggs does not remember if she ever said anything to Waters to indicate her lack of appreciation for this greeting, but each time Waters hugged her, she "shrugged" away from him.  Part of the reason for her discomfort was the fact that her coworkers had informed her that Briggs was a womanizer and that he liked to belittle women.[2]

During the course of her employment, Briggs was alone with Waters on only two occasions.  Only the second occasion, which occurred at some point after January 2001, is of relevance here.

---

[2]Waters allegedly greeted certain other female employees with hugs, but did not greet male employees in such a manner.  See Pl.'s Opp'n to Defs.' Mots. for Summ. J., Watson Dep. at 34-35.

3

On the night in question, Waters called down to the jail facility and asked Lieutenant Dorothy Clements ("Lieutenant Clements") which deputy sheriffs were working.  Lieutenant Clements subsequently called Briggs and told her to meet Waters at the intake and receiving area and drive him to the airport.  When she arrived at the intake and receiving area, Waters was waiting in a black Expedition, an unmarked police vehicle.

Waters drove the truck to the airport, with Briggs sitting in the passenger seat.  Although Briggs could not detect an odor of alcohol about Waters, she perceived Waters's speech to be slurred and he narrowly avoided a collision with a truck that was towing a boat.  At some point during the trip, he patted her leg and called her "pretty lady."  This made her feel very uncomfortable.  At no point did Waters make "sexual comments" to her or try to "grope" her.  Upon reaching the airport, Waters exited the truck and gave Briggs directions as to how to exit the airport area.

On November 4, 2004, Briggs was working the night shift at the jail facility.  She received a phone call from Waters, who asked about her marital status and then, after learning that she was single, asked if she would accompany him on an all expenses paid trip to Atlantic City.  Briggs did not want to decline the invitation because she feared that this would anger Waters.  Therefore, she replied that being the mother of a small child, she could not simply pick up and go on such a trip.  Waters explained

4

that he would provide her with plenty of time to find a babysitter, and added that if she accompanied him, he would provide her with a few hundred dollars of spending money.  He then asked for Briggs's email address, which she provided to him.

Briggs brought the phone call to the attention of Lieutenant Randy Riddick ("Lieutenant Riddick") and Sergeant Mack Keese ("Sergeant Keese").  Briggs was surprised, but not upset, about Waters's invitation.  Later that night, she received an email from Waters that contained the details of the trip he had planned for them.  Having no interest in accompanying Waters, Briggs decided to ignore the email.  At this point, Briggs was both surprised and upset by Waters's actions.  She showed the email to Lieutenant Riddick and Sergeant Keese, and Lieutenant Riddick advised her to save it.  At no point in time did Briggs refer to Waters's overtures as sexual harassment or request that Lieutenant Riddick or Sergeant Keese file a complaint or otherwise report the incidents in question on her behalf.

On November 6, 2004, Waters sent another email to Briggs, asking her if she had received the first email.  To this, Briggs simply replied "yes" by email.  Although Waters's overtures upset Briggs, neither her performance at work nor her attitude at work changed as a result of Waters's phone call and emails.  After sending Briggs the second email, Waters never again called or emailed Briggs and she had no further contact of any kind with him.

Apart from the interactions with Briggs described above, there were various other occasions on which Waters allegedly behaved inappropriately towards Briggs and other female employees while holding the office of Sheriff.  According to William O. Watson ("Watson"), who worked as a deputy sheriff under Waters before ultimately replacing him as Sheriff of the City of Portsmouth, Waters "thought he had a harem going" and was always "putting the blast on females here."  Pl.'s Opp'n to Defs.' Mots. for Summ. J., Watson Dep. at 18.  Certain unidentified female employees were flirtatious with Waters because they "had to play the game if they wanted to keep their job."  Id. at 45.

Waters's inappropriate behavior was allegedly not confined to the workplace.  For example, Watson asserts that he observed Waters "rub up" against female deputy sheriffs while talking with them at parties.  Id. at 20.  On another occasion, Watson asserts that he and Waters were standing together at a location outside of the workplace and Briggs walked by wearing shorts and pushing a baby carriage, at which point Waters made a vulgar reference about Briggs's anatomy.  Id. at 26.[3]  Waters further stated that Briggs "had some nice boobs and a cute ass."  Id. at 27.

At the time of the events in question, the City of Portsmouth Sheriff's Office generally followed the City of Portsmouth's

---

[3]The specific comment is quoted by Watson in his deposition at page 26.

administrative policy with respect to sexual harassment.  At the
time that the events relevant to this lawsuit occurred, the City of
Portsmouth's policy provided that "[u]nwelcome sexual advances,
requests for sexual favors, and other verbal or physical contact of
a sexual nature constitute sexual harassment when . . .
[s]ubmission to or rejection of such conduct by an individual is
used as a basis for employment decisions affecting the individual."
Waters's Mem. in Supp. of Mot. for Summ. J., Ex. O at 1.  It listed
"[u]nnecessary physical contact of any kind (brushing against,
patting, pinching, etc.)" as an example of sexual harassment.  Id.
In addition, the City of Portsmouth Sheriff's Office had a policy
regarding the proper procedure for reporting complaints of sexual
harassment.  Pursuant to that policy, sexual harassment complaints
were supposed to be reported up the chain of command, with the
exception that the victim of sexual harassment could skip over his
or her direct supervisor if the supervisor was responsible for the
harassment.  No complaints of sexual harassment were made about
Waters or any other employee at any time during Waters's tenure as
Sheriff.[4]  Briggs, for example, never made any formal or informal
complaint about any of the conduct of Waters that made her upset or
uncomfortable.

_____

[4]One employee of the City of Portsmouth Sheriff's Office
explained that complaining to Waters about Waters would be like
"going to a tree, talking to that tree and expect for that tree to
give you an answer."  See Pl.'s Opp'n to Defs.' Mots. for Summ. J.,
Keese Dep. at 34.

On Saturday, November 21, 2004, Briggs and a few of her girlfriends were riding motorcycles at the home of one of her friends.  Later that night, the women departed in two separate vehicles, with Briggs sitting in the passenger seat of a vehicle driven by Dawn Butler ("Butler").  The other vehicle was driven by Sherri Holland ("Holland").  Briggs and her friends had consumed small quantities of alcohol that evening but were not intoxicated.

As both vehicles were traveling towards Briggs's home, the vehicle driven by Holland was pulled over by Officer Leslie O. Cox Jr. of the Portsmouth Police Department ("Officer Cox").  Butler subsequently pulled in front of the two vehicles and parked. Briggs exited and, for safety reasons, identified herself to Officer Cox as a deputy sheriff of the City of Portsmouth Sheriff's Office.  She informed Officer Cox that if Holland, her friend, needed a ride home, Briggs could provide one.  Officer Cox instructed Briggs to return to her vehicle, and Briggs complied with that request.

After Briggs returned to her vehicle and was seated in it, Officer William R. Lasky Jr. ("Officer Lasky"), another officer of the Portsmouth Police Department, recognized Briggs, approached her, and asked her what she was doing there.  Briggs explained to Officer Lasky that Holland was a friend of hers and that Briggs could drive her home if necessary.  Officer Lasky asked Briggs to exit her vehicle and come with him.  Briggs complied with this

request, but was again asked by Officer Cox to return to her vehicle.  Briggs did so.  Holland was arrested for driving under the influence and failing to stop at a stop sign, and was ultimately also charged with refusing to take a breathalyzer test.

Officer Cox viewed this sequence of events as an attempt by Briggs to stop him from arresting her friend.  He sent a written complaint to Richard K. Williams, the internal affairs investigator of the City of Portsmouth Sheriff's Office ("Investigator Williams"), providing notification of his intent to seek a warrant for Briggs's arrest for obstruction of justice.  Such a warrant issued on November 23, 2004.  Neither Waters nor anyone else at the City of Portsmouth Sheriff's Office was involved in the decision to seek the warrant against Briggs or the decision to issue it.

Although Briggs was concerned that an adverse employment action might occur as a result of the obstruction of justice charge, her coworkers were supportive and she continued to work as a deputy sheriff in the jail facility after the arrest warrant was issued.  She received reassurances from her supervisors that she could continue to work as a deputy sheriff while the charge was pending.  The official policy of the City of Portsmouth Sheriff's Office required employees to "comply with all laws."  Waters's Mem. in Supp. of Mot. for Summ. J., Ex. L at 2.  It further provided that "[a] conviction for any violation of local, state or federal laws is sufficient to violate this section."  Id. (emphasis added).

9

Waters instructed Investigator Williams to "track" the charge against Briggs, but to avoid becoming involved in the criminal matter.

On January 25, 2005, Briggs appeared before the Portsmouth General District Court on the obstruction of justice charge. The judge heard only very limited testimony before finding her guilty. Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 53-54. Officer Cox's testimony indicated that prior to the arrival of Officer Lasky, Briggs had done nothing more than exit her vehicle and identify herself as a deputy sheriff. Id. at 53. The judge told Briggs that his mind was made up and refused to hear some of her witnesses.[5] The judge fined Briggs $100 but imposed no jail time. See Waters's Mem. in Supp. of Mot. for Summ. J., Ex. E. Briggs immediately appealed her conviction. Under Virginia law, the perfection of her appeal rendered the judgment against her a nullity pending a de novo trial in the Portsmouth Circuit Court. See Corbin v. Commonwealth, 44 Va. App. 196, 208, 604 S.E.2d 111, 117 (2004) ("Of course, because the appeal of a conviction from the general district court to circuit court results in a trial de novo, perfecting the appeal in the district court renders the judgment a

_____

[5]Briggs has stated that she was not allowed to call witnesses. See Pl.'s Opp'n to Defs.' Mots. for Summ. J., Ex. E. But it appears that Officer Lasky was subpoenaed by Briggs and testified at the hearing. See Pl.'s Opp'n to Defs.' Mots. for Summ. J., Lasky Dep. at 18. Presumably, Briggs was not allowed to call any witnesses other than Officer Lasky.

nullity."); <u>see also</u> Va. Code Ann. § 16.1-136; Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 20 (explaining that once Briggs noted her appeal in the general district court, her conviction in that court "should have been nonexistent in reality").

The City of Portsmouth Sheriff's Office did not conduct a formal investigation of the events forming the basis for the obstruction of justice charge. Investigator Williams, however, spoke with Officer Lasky regarding the events in question and attended Briggs's hearing in the Portsmouth General District Court. He came to believe that the events in question did not warrant a criminal prosecution for obstruction of justice, let alone a conviction. He felt that the matter could have been dealt with administratively.

Despite the fact that Briggs appealed her conviction, Waters suspended her from work, placing her on administrative leave pending the outcome of her appeal. Briggs and others initially hoped that her appeal would be heard before she ran out of leave time. On February 25, 2005, Waters sent a letter to Briggs informing her that her leave time would be exhausted as of March 8, 2005, at which time Waters would terminate her employment. He explained that she would remain free to reapply should she prevail on appeal. At no time prior to receiving this letter was Briggs warned that she might be fired if she ran out of leave time before

her appeal was decided.

As a result of several continuances, the date set for the appeal was ultimately extended beyond March 8, 2005. Consequently, Briggs's employment was terminated on that date. Decisions to terminate employees of the City of Portsmouth Sheriff's Department were typically initiated by officers below Waters in the chain of command. In this case, Waters personally made the decision to fire Briggs. Briggs was "very well thought of and nobody really wanted to terminate her." Pl.'s Opp'n to Defs.' Mots. for Summ. J., Waters Dep. at 14. Lieutenant Riddick was the person most knowledgeable about Briggs's performance at the time her employment was terminated, but he was not consulted about the decision to terminate Briggs.

Briggs's appeal was ultimately scheduled for May 13, 2005. On this date, however, before the appeal could be heard, Briggs entered into an agreement with the prosecution that provided that the charge against Briggs would be dismissed if she remained on good behavior for six months and performed forty hours of community service. On November 18, 2005, the charge against Briggs was dismissed after she held up her end of the agreement.

Briggs, who felt that Waters terminated her employment because she had rejected his invitation to accompany him to Atlantic City, decided not to reapply to work for him. Instead, she assisted Watson in his campaign to become the new Sheriff of the City of

Portsmouth.  Watson was elected and, in January 2006, he replaced Waters as Sheriff.  Watson rehired Briggs soon thereafter.

Briggs was not the first employee of the City of Portsmouth Sheriff's Department to be disciplined after being charged with or convicted of a criminal offense.  Waters's reaction to such situations typically varied depending upon the nature of the criminal offense.  For very serious crimes, an employee might be fired immediately following his or her arrest.  For other crimes, an employee would not be disciplined unless and until he or she was convicted.  For example, certain deputy sheriffs were fired by Waters after they were arrested for smuggling drugs to inmates in the jail facility.  Also, Lieutenant Paul Bringazi ("Lieutenant Bringazi") punched a fellow law enforcement officer while off-duty and was charged with felony assault on a law enforcement officer. He was placed on administrative leave as soon as he was charged with this offense.  Lieutenant Bringazi was ultimately found guilty of disorderly conduct, for which he received a six-month jail sentence with six months suspended, and obstruction by force, for which he received an identical sentence.  It is not clear if he appealed these convictions.  These crimes, like obstruction of justice, are Class 1 misdemeanors under Virginia law.  See VA. CODE ANN. §§ 18.2-415; 18.2-460(A), (B).  Prior to being convicted of these two crimes, the City of Portsmouth Sheriff's Office had disciplined Lieutenant Bringazi for other conduct on several

occasions.   After he was convicted, Major Jack Benzie ("Major Benzie") sent him a letter notifying him that he would be immediately terminated, but that he could appeal this decision, presumably to Waters.   Waters ultimately permitted him to resign in lieu of being terminated.

Not every employee convicted of a criminal offense was fired by Waters.   For example, Dain Davis ("Davis"), a deputy sheriff, was convicted of driving under the influence in traffic court. This crime is a Class 1 misdemeanor under Virginia law and has a mandatory minimum fine of $250.   VA. CODE ANN. § 18.2-270(A).   He received a suspended sentence of ninety days and his license was restricted for twelve months.   He was not fired by Waters as a result, but he was not allowed to drive a department vehicle while his license was restricted.   As a further example, Major Benzie was charged with driving under the influence and ultimately convicted of reckless driving, which is also a Class 1 misdemeanor under Virginia law.   See VA. CODE ANN. § 46.2-868(A).   His employment was not terminated as a result.

Numerous other employees of the City of Portsmouth Sheriff's Office were disciplined for off-duty conduct during Waters's tenure.[6]   For example, an employee named Poteat engaged in actions

---

[6]During his deposition, Captain William Facenda indicated that one or two other employees were convicted of obstruction of justice during his tenure of employment.   Waters's Mem. in Supp. of Mot. for Summ. J., Facenda Dep. at 29.   Nothing in the materials submitted by the parties indicates what discipline, if any, was

while off-duty in Chesapeake that were reckless and exhibited a disregard for the standard of the City of Portsmouth Sheriff's Office.  He received a formal reprimand.  Another employee, Sharon Scott-Wilson, was placed on administrative leave pending the resolution of a criminal charge against her, but was not fired when she ran out of leave time.  Instead, she was placed on administrative leave without pay.

## B.  Procedural History

On July 16, 2005, while Waters was still Sheriff of the City of Portsmouth, Briggs filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Virginia Council on Human Rights against the City of Portsmouth Sheriff's Office.  She alleged that she had been sexually harassed and retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Virginia Human Rights Act, VA. CODE ANN. §§ 2.2-3900 to 2.2-3902 ("VHRA").

On or about February 24, 2006, Briggs initiated this action by filing a complaint in the Portsmouth Circuit Court, naming Waters, Officer Cox, and the City of Portsmouth ("the City") as defendants. In her complaint, Briggs alleged claims of sexual harassment and retaliation under Title VII against Waters and the City and alleged a state law claim of malicious prosecution against Officer Cox.  On

---

imposed on these employees.

15

March 17, 2006, Waters, with the consent of Officer Cox and the City, removed the case to this court.

On March 27, 2006, Waters filed a motion to dismiss. A few days later, on March 31, 2006, the EEOC issued a dismissal and notice of rights, notifying Briggs of her right to sue the City of Portsmouth Sheriff's Office. On April 10, 2006, Briggs filed a motion to amend her complaint and a motion to stay the ruling on the motion to dismiss. Briggs also submitted her proposed amended complaint to the court on this date. On April 17, 2006, the City filed its own motion to dismiss. On May 3, 2006, the court dismissed with prejudice the malicious prosecution claim against Officer Cox, pursuant to an agreed order of the parties.

In an Opinion and Order dated June 28, 2006, this court dismissed Briggs's Title VII claims against Waters and the City, granted Briggs leave of court to amend her complaint, and directed the Clerk to file Briggs's amended complaint. Briggs v. Waters, No. 06-154, 2006 WL 1982758, at *4 (E.D. Va. June 28, 2006). This court reasoned that Briggs could not bring Title VII claims against Waters in his official capacity as Sheriff of the City of Portsmouth because he no longer held that office. Id. at *2. The court further reasoned that Briggs could not sue Waters in his individual capacity or the City because neither of these defendants was Briggs's employer within the meaning of Title VII. Id. at *2-3. The court explained that the "Sheriff's Office" was Briggs's

16

employer within the meaning of Title VII.  Id. at *3.

In her amended complaint, Briggs named Waters, the City of Portsmouth Sheriff's Office, and Watson, in his official capacity as Sheriff of the City of Portsmouth, as defendants.  Count One of the amended complaint alleged sexual harassment and retaliation in violation of Title VII.  With respect to her allegations of sexual harassment, Briggs claimed that Waters caused her to be charged with obstruction of justice and that when Waters terminated her employment, he treated her differently than other employees, who had not rebuffed Waters's unwelcome sexual advances.  She further described a sexually hostile environment created by Waters and the City of Portsmouth Sheriff's Office that interfered with her ability to work.  Count Two alleged a claim under 42 U.S.C. § 1983 based on a purported violation of Briggs's constitutional right to equal protection.  In support of Count Two, Briggs incorporated the factual allegations made in support of Count One.  Briggs seeks compensatory damages, to include back pay, against all remaining defendants, and punitive damages against Waters.

On July 26, 2006, Waters filed a motion to dismiss, arguing that Briggs had failed to state a claim upon which relief can be granted in her amended complaint and that, in any event, qualified immunity shielded him from Briggs's claims of sexual harassment.

The Sheriff Defendants filed a motion to dismiss on July 28, 2006.[7] They conceded that Briggs's amended complaint stated a claim upon which relief can be granted with respect to some of her allegations of sexual harassment, but argued that she had failed to state a Title VII claim for retaliation.  They further argued that the Sheriff Defendants could not, as a matter of law, be found liable for any acts of sexual harassment that occurred during Waters's administration.

On October 3, 2006, this court issued a Memorandum Opinion granting-in-part and denying-in-part the motions to dismiss. Briggs v. Waters, 455 F. Supp. 2d 508, 511 (E.D. Va. 2006).  At a threshold level, the court reasoned that it was proper to hold the Sheriff Defendants liable for the acts of Waters, Watson's predecessor.   Id. at 516.   Next, the court dismissed Briggs's Title VII claims against Waters, noting that the court had already ruled that Briggs could not bring such claims against Waters in the Opinion and Order of June 8, 2006.  Id. at 516-17.  With respect to Briggs's Title VII retaliation claim, the court concluded that Briggs had failed to state a claim upon which relief can be granted and dismissed this claim as to all defendants.  Id. at 517.  The court, however, concluded that Briggs had stated a claim upon which relief can be granted with respect to her allegations of sexual

_____

[7]See supra note 1 (explaining that the court will refer to Watson and the City of Portsmouth Sheriff's Office in this Opinion and Order collectively as "the Sheriff Defendants").

harassment.  Id. at 518.  The court explained that Briggs had properly alleged two different forms of sexual harassment, hostile work environment sexual harassment and wrongful termination,[8] and that both forms of sexual harassment were actionable under Title VII and 42 U.S.C. § 1983.  Id. at 518-19.  Finally, the court turned to Waters's claim of qualified immunity and reasoned that Waters was entitled to such immunity as to Briggs's allegations of hostile work environment sexual harassment but not as to her allegations of wrongful termination.  Id. at 519-20.  At this point in the litigation, the following claims remained pending: (1) Briggs's Title VII claim against the Sheriff Defendants on the grounds of wrongful termination and hostile work environment sexual harassment; (2) Briggs's 42 U.S.C. § 1983 claim against the Sheriff Defendants on these same grounds; and (3) Briggs's 42 U.S.C. § 1983 claim against Waters on the ground of wrongful termination.

On April 9, 2007, Waters filed a motion for summary judgment,

---

[8]In the Memorandum Opinion of October 3, 2006, the court used the term "quid pro quo sexual harassment" to refer to Briggs's allegations that she was wrongfully terminated because she had rebuffed Waters's sexual advances.  Courts typically classify sexual harassment as either hostile work environment sexual harassment or quid pro quo sexual harassment.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998) (discussing the difference between the two forms of sexual harassment).  Quid pro quo sexual harassment has occurred when "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands."  Id.  In this Opinion and Order, the court will generally use the term wrongful termination, rather than quid pro quo sexual harassment, to refer to Briggs's allegations that she was fired because she rebuffed Waters's sexual advances.

arguing that he is entitled to judgment as a matter of law for the following three independent reasons: (1) Briggs cannot establish a prima facie case of wrongful termination; (2) Waters has come forward with a legitimate nondiscriminatory reason for terminating Briggs's employment, and Briggs cannot establish that this reason was a pretext for discrimination; and (3) Waters is entitled to qualified immunity.  On April 17, 2007, the Sheriff Defendants filed their own motion for summary judgment, arguing that they are entitled to summary judgment because Briggs cannot, as a matter of law, establish that she was wrongfully terminated or subjected to a hostile work environment.  On April 19, 2007, the court received Briggs's response in opposition to Waters's motion for summary judgment and the Sheriff Defendants' motion for summary judgment. On April 24, 2007, the court received Waters's reply.  On April 26, 2007, the court received the Sheriff Defendants' reply.  This matter is now ripe for disposition.

### III.  Analysis

It is well-settled that this court applies the standards developed in Title VII litigation to similar litigation arising under 42 U.S.C. § 1983.  <u>Beardsley v. Webb</u>, 30 F.3d 524, 529 (4th Cir. 1994).  Thus, with respect to each of the grounds for Briggs's claims, the court will concurrently address whether Briggs can avoid judgment as a matter of law under Title VII and 42 U.S.C. § 1983 by applying the standards developed by courts for Title VII

litigation.

## A.  Wrongful Termination

Briggs alleges wrongful termination as a basis for her claims and seeks to avert summary judgment by proceeding under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under that framework, this court must first consider whether the plaintiff has established a prima facie case of discrimination.  <u>Lettieri v. Equant Inc.</u>, 478 F.3d 640, 646 (4th Cir. 2007).  The elements required to establish a prima facie case of discrimination vary depending upon the nature of the case.  <u>See McDonnell Douglas</u>, 411 U.S. at 802 & n.13.  As the Third Circuit has explained, "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." <u>Wishkin v. Potter</u>, 476 F.3d 180, 185 (3d Cir. 2007).  If the plaintiff establishes a prima facie case, the burden of going forward shifts to the defendant to articulate a nondiscriminatory reason for the offending actions.  <u>Lettieri</u>, 478 F.3d at 646.  If the defendant articulates one or more such reasons, the burden shifts back to the plaintiff to demonstrate that the defendant's reasons were merely a pretext for discrimination.  <u>Id.</u>

In this case, Briggs seeks to establish a prima facie case of discrimination based on her wrongful termination in two ways. First, she argues that she can establish a prima facie case of quid pro quo sexual harassment, namely that Waters fired her because she

21

rebuffed his sexual advances.  Second, she contends that she can establish a prima facie case of disparate treatment in the enforcement of disciplinary measures.  Waters and the Sheriff Defendants disagree with each of these arguments.  They further contend that even if Briggs can establish a prima facie case of discrimination, they have come forward with legitimate and nondiscriminatory reasons for terminating Briggs's employment, and Briggs cannot show that each of these reasons was a pretext for discrimination.  In addition, Waters argues that, in any event, he is entitled to qualified immunity.

### 1.  Quid Pro Quo Sexual Harassment

Courts have specially tailored the elements required to establish a prima facie case of discrimination in cases of quid pro quo sexual harassment.  Quid pro quo sexual harassment refers to a situation where a supervisor explicitly makes submission to his or her unwelcome sexual advances a condition of employment, and also encompasses situations where submission to unwelcome sexual advances is not explicitly made a condition of employment, but the rejection of such advances is nevertheless the motivation underlying an employer's decision to take an adverse employment action against an employee.  See Ellis v. Director, CIA, No. 98-2481, 1999 WL 704692, at *3 (4th Cir. Sept. 10, 1999) (discussing quid pro quo sexual harassment and explaining that "'[w]hen a plaintiff proves that a tangible employment action

22

resulted from a refusal to submit to a supervisor's sexual demands,'" he or she establishes a violation of Title VII (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998))); Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026-27 (8th Cir. 2004) ("Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands."). The elements of a prima facie case of quid pro quo sexual harassment are as follows:

1. The employee belongs to a protected group.

2. The employee was subject to unwelcome sexual harassment.

3. The harassment complained of was based upon sex.

4. The employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

5. The employer . . . knew or should have known of the harassment and took no effective remedial action.

Brown v. Perry, 184 F.3d 388, 393 (4th Cir. 1999). The fifth element is satisfied automatically when the sexual harassment was perpetrated by a supervisor. Id.

In this case, Waters and the Sheriff Defendants argue that Briggs cannot establish the second and fourth elements. With

respect to the second element, the court must first consider whether the conduct complained of was unwelcome.  Advances are unwelcome if the plaintiff regarded them as undesirable or offensive and did not solicit or incite them.  Lewis v. Forest Pharm., Inc., 217 F. Supp. 2d 638, 647 (D. Md. 2002) (citing Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982)).  The plaintiff's response to the advances provides evidence of unwelcomeness.  Id.

In support of her claims, Briggs directs the court's attention to the fact that Waters called and emailed her on November 4, 2004, inviting her to accompany him on an all expenses paid trip to Atlantic City.  She argues that this conduct was unwelcome, and that her response to the conduct supports this conclusion.  Specifically, during their initial phone call, Briggs made an excuse as to why she could not accompany him.  Then, when Waters sent a follow-up email with the details of the trip, Briggs declined to respond.  When Waters sent another email to confirm that she had received the first email, she simply replied "yes."  Waters had, on many occasions, hugged Briggs, only to have her shrug away from him.  Furthermore, it is clear that Waters's invitation upset Briggs and, like his efforts to hug her, made her very uncomfortable.  Viewed in this context, Waters's invitation could only be perceived as unwelcome.

Having concluded for the purposes of summary judgment that

24

Waters's invitation was unwelcome, the court must next address whether Waters's conduct constituted a sexual advance. To establish the existence of a sexual advance, a plaintiff need not show that an explicit request for sex was made. <u>Lewis</u>, 217 F. Supp. 2d at 647. Rather, "[w]ords and actions that implicitly proposition suffice." <u>Id.</u>

The facts, as viewed most favorably to Briggs at this juncture, show that at the outset of their initial conversation on November 4, 2004, Waters asked Briggs if she was single. He had previously made explicit and offensive comments to Watson regarding the attractiveness of certain physical attributes that she possessed. <u>See</u> Pl.'s Opp'n to Defs.' Mots. for Summ. J., Watson Dep. at 26-27. In addition, Waters had frequently made unnecessary physical contact with Briggs by hugging her and, on one occasion, patting her leg. Moreover, when Waters asked her to accompany him to Atlantic City, he and Briggs had never dated, and they apparently rarely interacted apart from Waters's "special greeting" for her. Under such circumstances, the invitation to accompany Waters on a trip to a Atlantic City may well not be construed by the jury as an innocent request for a date,[9] but rather as an implicit proposition and thus a sexual advance. <u>See</u> <u>Early v.</u>

_____

[9]When asked to explain the nature of his invitation during his deposition, Waters explained that "she was single and I was single. And we're both adults." Pl.'s Opp'n to Defs.' Mots. for Summ. J., Waters Dep. at 30.

Morris Newspaper Corp., 54 F. Supp. 2d 1261, 1268 (M.D. Ala. 1999) (concluding that a request for a date qualified as a sexual advance because a reasonable juror could construe it as such). Accordingly, Briggs has come forward with sufficient facts to establish the second element of quid pro quo sexual harassment.

To establish the fourth element, a plaintiff must show that the "employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment." Brown, 184 F.3d at 393. In other words, the plaintiff must establish, through direct or circumstantial evidence, a nexus or causal connection between the acceptance or rejection of the unwelcome sexual advances and the employment decision complained of. See Lewis, 217 F. Supp. 2d at 648 (explaining that the plaintiff "must also show a causal connection between her rejection of [the] sexual overtures and the various employment actions she has suffered"). Courts have long-recognized the difficulty of determining whether the requisite causal connection is present in cases where the acceptance of harassment was purportedly an implied condition, rather than an explicit condition, of receiving a job benefit or avoiding a job detriment. The Ninth Circuit, for example, has explained that "quid pro quo harassment is clear if a manager explicitly tells his subordinate 'I will fire you unless you sleep with me.'" Nichols v. Frank, 42 F.3d 503, 512 (9th Cir. 1994). It is less clear,

26

however, where "the manager merely invites the employee out for a drink on one or more occasions but does not suggest that he wishes to discuss work-related matters" and, some time after the manager is spurned, he or she takes an adverse employment action against the subordinate.[10]  Id.  Such a situation may set off "alarm bells," but the plaintiff would need to come forward with additional evidence to establish a causal connection between the rejection of sexual advances and the adverse employment action.  Id.

In cases of implicit conditioning, causation "can be inferred only from the particular facts and circumstances of the case."  Id.  "[T]here is no substitute for a rigorous examination in each instance of all of the relevant facts and circumstances, as well as the application of common sense, sound general principles, and a true understanding of human nature."  Id. at 513; see Gregory v. Daly, 243 F.3d 687, 700 (2d Cir. 2001) (explaining that "when allegations of a sexual quid pro quo co-exist with allegations of other circumstances suggesting that the challenged employment actions were taken because of plaintiff's sex, we look to the totality of the circumstances to determine whether there is a sufficient basis to infer sex-based discrimination").  As the Third Circuit has explained, "a plaintiff may rely upon a broad array of evidence" to establish the requisite causal link, and a court can

---

[10]This type of implicit sexual harassment is "far more likely to take place than is the explicit variety."  Nichols, 42 F.3d at 512.

consider circumstantial evidence and draw inferences in favor of the plaintiff in determining whether the causal link has been established.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283-84 (3d Cir. 2000).

Of course, one way to establish the requisite nexus is to show that "the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision." Lewis, 217 F. Supp. 2d at 648-49 (citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)); see also Nichols, 42 F.3d at 512-13 (noting that another way to establish sexual harassment is by showing a "verbal nexus").  In Lewis, the court concluded that the plaintiff established causation where only about one month elapsed between the plaintiff's rejection of a sexual advance and her receipt of a damaging reprimand written by the harasser.  217 F. Supp. 2d at 649.  Similarly, in Rachel-Smith v. FTData, Inc., 247 F. Supp. 2d 734 (D. Md. 2003), the court found that the plaintiff established causation by showing that she was placed on probation by a general manager about two weeks after she sent an email rebuffing his unwelcome sexual advances.  Id. at 746. By contrast, in Carter v. New York, 310 F. Supp. 2d 468 (N.D.N.Y. 2004), the court concluded that a plaintiff failed to establish causation where four months elapsed between an attempted kiss and the employment action complained of.  Id. at 478.  However, as the

28

Second Circuit has explained, there is no bright-line rule for defining when a temporal relationship becomes too remote to support a discrimination claim.  <u>Gorman-Bakos v. Cornell Co-op Extension of Schenectady County</u>, 252 F.3d 545, 554 (2d Cir. 2001).

In this case, an examination of the circumstances surrounding Briggs's termination, coupled with the application of common sense and an understanding of human nature, leads this court to conclude that Briggs has come forward with sufficient facts to establish that the termination of her employment was causally connected to her rejection of Waters's advances and invitation to accompany him to Atlantic City.  At a threshold level, the court notes that there is no indication that Briggs ever received a hearing before Waters or anyone below him in the chain of command.  To the extent that Waters had information at his disposal regarding Briggs's incident with Officer Cox, the information indicated that prior to the arrival of Officer Lasky, Briggs had done nothing more than exit her vehicle and identify herself to Officer Cox as a deputy sheriff.  Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 53.  After Officer Lasky arrived, she did nothing more than follow his instructions.  At worst, her conduct showed some "bad judgment."  <u>Id.</u> at 25.

Importantly, Briggs was not the first employee of the City of Portsmouth Sheriff's Office to exhibit "bad judgment" while off-duty, and many other employees exhibited poor judgment outside the

29

workplace but were not fired by Waters.  Davis, for example, was convicted of driving under the influence, which is a Class 1 misdemeanor under Virginia law.  See VA. CODE ANN. § 18.2-270(A).[11] This is obviously an offense of a very serious nature, as it endangers members of the public at large.  Nevertheless, Davis received a formal reprimand, a disciplinary measure that stands in stark contrast to being placed on administrative leave and ultimately terminated.  In addition, Major Benzie wrecked a vehicle, which the City paid to repair, was charged with driving under the influence, and was convicted of reckless driving, a Class 1 misdemeanor under Virginia law.  See VA. CODE ANN. § 46.2-868(A).  Like Davis, he was not fired.

Waters and the Sheriff Defendants repeatedly direct the court's attention to Lieutenant Bringazi, who resigned after receiving a letter from Major Benzie notifying him that he would be terminated.  But it is undisputed that Lieutenant Bringazi physically "punched" another law enforcement officer while off-duty

---

[11]Driving under the influence is at least of comparable seriousness as obstruction of justice, and is arguably a more serious offense.  Driving under the influence, unlike obstruction of justice, carries a mandatory minimum fine, which indicates at least to some extent that it has been deemed a more serious offense in Virginia.  See VA. CODE ANN. § 18.2-270(A).  It should also be noted that prior to 2002, obstruction of justice was classified as a Class 2 misdemeanor, which provides some indication that it is a less serious offense than driving under the influence.  See Act of April 8, 2002, 2002 Va. Laws 810 § 18.2-460; see also VA. CODE ANN. § 18.2-11 (describing the maximum punishment for Class 1 and Class 2 misdemeanors).

and was charged with felony assault on a law enforcement officer. Moreover, he was convicted of two Class 1 misdemeanors, including obstruction by force, and he received a suspended sentence of six months for each offense.  His conduct was thus clearly more serious than the conduct engaged in by Briggs, who received a $100 fine for her actions.  Briggs's incident with Officer Cox neither involved force nor an intent to harm another person.

Various other circumstances support this court's finding of causation.  For instance, it is undisputed that decisions to terminate employees of the City of Portsmouth Sheriff's Office typically originated from officers below Waters in the chain of command.  In this case, Waters fired Briggs, despite the fact that "nobody really wanted to terminate her."  Pl.'s Opp'n to Defs.' Mots. for Summ. J., Waters Dep. 13-14.  While this was not the first time Waters personally terminated an employee, it is logical, after Briggs spurned his Atlantic City trip invitation, that the decision to terminate Briggs's employment should originate from someone other than Waters himself.  He arguably at least should have envisioned how his actions would be perceived by Briggs and others in the workplace.  Both established law and common sense, under the circumstances of this case, would dictate that Waters exercise caution in disciplining Briggs.

Moreover, Briggs was placed on administrative leave less than three months after she rejected Waters's trip invitation, and the

ultimate termination of Briggs's employment occurred within several months of the rejection.  These facts, without more, would likely be insufficient to raise an inference of causation.  However, the facts are sufficient when viewed in the light most favorable to Briggs, together with Waters's perceived sexual desire for her and her apparent shrugging away from his advances, all of which spanned a period of years, not months.  Any animosity Waters developed towards Briggs after she spurned him arguably could have persisted for a few months.  It is also worth noting that Briggs was charged with obstruction of justice a few weeks after she rejected Waters's invitation.  With the rejection fresh in his mind, Waters could have foreseen an opportunity to retaliate against Briggs.

Also, Waters declined to speak with Lieutenant Riddick, the supervisor most familiar with Briggs's work performance, prior to terminating her employment.  This is another factor that standing alone, would likely avail Briggs nothing.  But, when viewed in the context of the other unusual circumstances surrounding Briggs's termination, it lends additional support to her arguments.  In sum, when the circumstances surrounding Briggs's termination are considered together, it is clear that Briggs has come forward with sufficient facts to establish the requisite causal connection between her termination and her rejection of Waters's invitation to avoid summary judgment.

Because Briggs has established a prima facie case of

discrimination, the burden shifts to Waters and the Sheriff Defendants to come forward with a legitimate nondiscriminatory reason for the termination of her employment. Waters and the Sheriff Defendants provide the following three reasons: (1) Briggs was convicted of obstruction of justice; (2) Briggs ran out of leave time while the appeal of her conviction was pending; and (3) the offense of obstruction of justice is a particularly serious offense to members of the law enforcement community. The court assumes, for the sake of argument, that these reasons are legitimate and nondiscriminatory. The burden thus shifts back to Briggs to show that each of these reasons was a pretext for discrimination. See Lettieri, 478 F.3d at 646.

To establish that a reason proffered by an employer is a pretext for discrimination, the employee may show that the "proffered reason is not worthy of belief." Williams v. Staples, Inc., 372 F.3d 662, 669 (4th Cir. 2004). In doing so, the plaintiff may rely on the evidence used to establish his or her prima facie case. Id. With respect to the first purportedly legitimate reason offered to explain Briggs's termination, the court notes that although Briggs was convicted in the general district court, that conviction was nullified when she perfected her appeal. See Corbin v. Commonwealth, 44 Va. App. 196, 208, 604 S.E.2d 111, 117 (2004). As Investigator Williams noted during his deposition, the conviction "should have been nonexistent in

33

reality" after Briggs appealed.  Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 20.  Furthermore, as noted above, Davis and Major Benzie were, like Briggs, convicted of Class 1 misdemeanors but, unlike Briggs, were allowed to keep their jobs. Furthermore, the City of Portsmouth Sheriff's Office was aware that Briggs had received only a "limited hearing" in the general district court and had not been allowed to call some of her witnesses.  <u>See</u> Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 53-54.  Additionally, she was only fined $100 and no jail time was imposed.  These facts are sufficient to demonstrate that the first reason offered by the defendants is not worthy of belief and is actually a pretext for unlawful discrimination.

For essentially the same reasons, Briggs has come forward with sufficient facts to show the second reason proffered by the defendants is a pretext for discrimination.  After Briggs's appeal nullified her conviction, the information in the possession of the City of Portsmouth Sheriff's Office regarding Briggs's offense indicated that she had, at most, showed some bad judgment.  It is thus not clear why she was required to use her leave time while her appeal was pending.  It is also not clear why Waters waited until February 25, 2005, to inform Briggs that she would be terminated unless her appeal was heard before March 8, 2005, the date on which she would run out of leave time.  These circumstances seem particularly suspicious in light of the disciplinary measures taken

against Davis and Major Benzie for conduct far more serious than that engaged in by Briggs.[12]  In addition, Waters allowed at least one other employee to continue working after the employee used up all of the employee's leave time while a criminal charge was pending.

Finally, with respect to the third reason, the court notes that there is no indication that Waters communicated this reason to Briggs before terminating her, and although many of his senior staff were deposed, none mentioned hearing Waters articulate this justification.  See EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001) (explaining that "a factfinder could infer from the late appearance of [the employer's] justification that it is a post-hoc rationale, not a legitimate explanation for [the employer's] decision").  Moreover, as noted above, once Briggs perfected her appeal of the general district court's decision, her "conviction" was nullified.  Also, the City of Portsmouth Sheriff's Office knew that Briggs had received only a "limited hearing" in the general district court and that her conduct may not have warranted an obstruction of justice charge in the first instance. Pl.'s Opp'n to Defs.' Mots. for Summ. J., Williams Dep. at 25. Nevertheless, it declined to investigate the matter further before

---

[12]See infra note 14.

35

firing her.[13]   Given these circumstances, and the various other facts Briggs set forth in establishing her prime facie case, she has come forward with sufficient facts to show that her employer's purportedly legitimate reasons for terminating her employment were, in fact, a pretext for discrimination.  The issue of whether Waters unlawfully discriminated against Briggs when he fired her is thus one for a jury to resolve.

## 2.  Disparate Discipline

Briggs also seeks to establish a prima facie case of discrimination by proceeding under the analysis developed generally for disparate treatment claims premised on the discriminatory enforcement of disciplinary measures.  This court has previously permitted a plaintiff alleging sexual harassment to proceed under a standard disparate treatment analysis, rather than an analysis specially tailored for sexual harassment cases, and the defendants have not objected to Briggs's attempt to establish her claims in this manner.  See Delgado v. Lehman, 665 F. Supp. 460, 466 (E.D. Va. 1987); 1 Alba Conte, Sexual Harassment in the Workplace: Law and Practice 459 (3d ed. 2000) ("Courts have also accepted straight disparate treatment analyses to find sexual harassment-based sex discrimination without reference to quid pro quo sexual harassment.").   To establish a prima facie case of disparate

---

[13]It appears that Briggs was not granted a hearing, apart from the limited one in the general district court, prior to being terminated.

36

treatment based on the discriminatory enforcement of disciplinary measures, a plaintiff must show the following: "(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).

Briggs has made a sufficient showing to establish all three elements of the prima face case of discrimination under the general disparate treatment analysis. It is undisputed that she is a member of a protected class. For reasons already thoroughly discussed in this Opinion and Order, see supra Part III.A.1, she can also establish the second and third elements. The conduct engaged in by Davis, for example, was at least as serious as the conduct engaged in by Briggs.[14] Nevertheless, she was disciplined

---

[14]The Sheriff Defendants note that it is only proper for the court to consider "like offenses" in determining whether a plaintiff has established a prima facie case. See Sheriff Defs.' Br. in Supp. of Mot. for Summ. J. at 14. The plain language of the prima facie case, of course, merely requires conduct of "comparable seriousness." Notably, however, the Fourth Circuit has reasoned as follows in approving of a district court's disparate discipline analysis:

This finding commendably reflects an understanding both of the need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under

more severely than Davis.  The Sheriff Defendants attempt to explain the difference in treatment by arguing that an offense of obstruction of justice "strikes at the heart" of the job of police officers and deputy sheriffs.  Sheriff Defs.' Br. in Supp. of Mot. for Summ. J. at 13.  But, as already discussed, see supra Part III.A.1, Briggs has come forward with sufficient facts to show that this explanation is a pretext for discrimination.  In sum, Briggs has come forward with sufficient facts to avoid judgment as a matter of law by proceeding under the analysis developed for claims of disparate treatment in the enforcement of disciplinary measures.[15]

### 3.  Qualified Immunity

Waters argues that he is entitled to qualified immunity as to

---

the same sets of circumstances.

Cook, 988 F.2d at 511 (emphasis added).  In this case, the conduct of Briggs, like the conduct of Davis, involved the exercise of poor judgment while off-duty but involved neither the use of force nor an intent to harm another person.  Therefore, the court deems them worthy of comparison, particularly in light of the reality that the comparison will never involve precisely the same offenses.  See id.; Disher v. Weaver, 308 F. Supp. 2d 614, 621-22 (M.D.N.C. 2004) (concluding that a plaintiff established a prima facie case by showing that several fellow officers "did engage in conduct of comparable severity and were not fired").  On the other hand, the court does not find Briggs's conduct to be of comparable seriousness to that of Lieutenant Bringazi, who physically assaulted a fellow law enforcement officer and was charged with a felony.

[15]In their reply brief, the Sheriff Defendants have argued that Davis's disciplinary record is inadmissible.  Briggs has not had a meaningful opportunity to respond to this argument, and the court will rule on this issue, as necessary, at the trial.

Briggs's 42 U.S.C. § 1983 claim, which is pending against Waters only on the ground of wrongful termination.  The Fourth Circuit has explained that government officials performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Johnson v. Caudill, 475 F.3d 645, 650 (4th Cir. 2007) (internal quotation omitted).  As this court noted in the Memorandum Opinion of October 3, 2006, the gravamen of Briggs's amended complaint is that "she was discharged because she had rebuffed Waters's sexual advances."  Briggs v. Waters, 455 F. Supp. 2d 508, 520 (E.D. Va. 2006).  As discussed briefly below, Briggs's right to be free of this type of sexual harassment is certainly a clearly established right of which a reasonable person would know. See id.

Sexual harassment is a form of intentional sex discrimination. See Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994).  Sexual harassment, in turn, has been defined by the EEOC to include "[u]nwelcome sexual advances" when "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual."  29 C.F.R. § 1604.11(a)(2);[16]

_____

[16]The EEOC "Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) (internal quotation omitted).

see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54
(1998); see also Lankford v. City of Hobart, 27 F.3d 477, 480 (10th
Cir. 1994); Garber v. Saxon Bus. Prods., Inc., 552 F.2d 1032, 1032
(4th Cir. 1977) (per curiam); Rachel-Smith v. FTData, Inc., 247 F.
Supp. 2d 734, 746-47 (D. Md. 2003).   Furthermore, the sexual
harassment policy in effect at the City of Portsmouth Sheriff's
Office at the time of Briggs's termination provided a definition of
sexual harassment that mirrored the EEOC's definition.   See
Waters's Mem. in Supp. of Mot. for Summ. J., Ex. O at 1 (defining
sexual harassment to include "[u]nwelcome sexual advances" when
"[s]ubmission to or rejection of such conduct by an individual is
used as a basis for employment decisions affecting the
individual").   Thus, to the extent that in firing Briggs, Waters
was motivated by a desire to retaliate against her for rebuffing
his sexual advances, he acted in violation of a clearly established
right of which a reasonable person would know.

## B. Hostile Work Environment

Courts classify sexual harassment as either hostile work
environment sexual harassment or quid pro quo sexual harassment.
See Burlington Indus., 524 U.S. at 753-54 (discussing the
distinction between the two forms).   These categories, however, do
not reflect statutory proscriptions that separate "harassment" from
other forms of discrimination.   Gregory v. Daly, 243 F.3d 687, 698
(2d Cir. 2001).   Rather, "these labels, to the extent that they are

useful at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment." Id. (citing Burlington Indus., 524 U.S. at 751-52).  Where, as here, a plaintiff shows that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Indus., 524 U.S. at 753-54.  It follows that under such circumstances, a plaintiff need not show the existence of both a hostile work environment and wrongful termination to prevail on his or her claims under Title VII.[17]

In this case, Briggs has shown that a genuine issue of fact exists as to whether she was subject to unlawful quid pro quo sexual harassment based on her purportedly wrongful termination. Therefore, she need not establish the existence of a hostile work environment to avoid summary judgment on her claims against the Sheriff Defendants.  The court notes, however, that the ruling on the sufficiency of the facts to establish the existence of a hostile work environment will ultimately impact whether the issue

_____

[17]Because this court may apply the standards developed in Title VII litigation to similar litigation arising under 42 U.S.C. § 1983, see Beardsley, 30 F.3d at 529, it also follows that a plaintiff need not show both a hostile work environment and wrongful termination to prevail on his or her claims under 42 U.S.C. § 1983.

goes to the jury for decision and the content of the jury instructions.

To establish the existence of a hostile work environment, a plaintiff must "prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003). The third element has both subjective and objective components. Id. at 333. The plaintiff must show that the harassment was severe and pervasive to him or her personally. Id. The plaintiff must also show that the "work environment was objectively abusive, that is, abusive to a reasonable person in the plaintiff's position." Id. (internal quotation omitted). In determining whether the plaintiff has come forward with facts establishing an objectively abusive work environment, the court must "consider all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotation omitted).

At this juncture, the court denies summary judgment on the claim of a hostile work environment and reserves further ruling on this issue until the plaintiff has presented her prima facie case

42

at trial.

## IV.   Conclusion

For the reasons set forth above, Waters's motion for summary judgment is **DENIED** and the Sheriff Defendants' motion for summary judgment is **DENIED**.   The following claims remain pending in this lawsuit: (1) Briggs's Title VII claims of wrongful termination and hostile work environment against the Sheriff Defendants; (2) Briggs's 42 U.S.C. § 1983 claims of wrongful termination and hostile work environment against the Sheriff Defendants; and (3) Briggs's 42 U.S.C. § 1983 claim of wrongful termination against Waters.   The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for the parties.

**IT IS SO ORDERED.**



                              /s/
                    Rebecca Beach Smith
                    UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

May 4, 2007

43